FILED

SEP 23 2009

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                        Deputy Clerk

Neil R. O'Hanlon
HOGAN & HARTSON LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601

*Attorneys for United HealthCare Services, Inc.*

VIA FAX

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:08-bk-10277-BB |
| Axium International, Inc., | Chapter 7 |
| Debtor. | Jointly Administered With Case: |
| | Case No. 2:08-bk-10376-BB |
| | **LIMITED OPPOSITION OF UNITED HEALTHCARE SERVICES, INC. TO CHAPTER 7 TRUSTEE'S MOTION FOR ORDER AUTHORIZING SETTLEMENT OF CERTAIN AVOIDANCE POWER CLAIMS WITHOUT FURTHER HEARING OR NOTICE PURSUANT TO RULE 9019(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; DECLARATION OF ERIC J. NOYES** |
| | DATE:     October 6, 2009 |
| | TIME:     2:00 p.m. |
| | PLACE:   Courtroom "1475" |
| | Substantively Consolidated With Cases: |
| | Case No. 2:08-bk-10294-BB |
| | Case No. 2:08-bk-10327-BB |
| | Case No. 2:08-bk-10339-BB |
| | Case No. 2:08-bk-10304-BB |

LIMITED OPPOSITION OF UNITED
HEALTHCARE SERVICES, INC. TO CHAPTER 7
TRUSTEE'S MOTION FOR ORDER
AUTHORIZING SETTLEMENT OF CERTAIN
AVOIDANCE POWER CLAIMS WITHOUT
FURTHER NOTICE OR HEARING

\\\LA - 086335/000040 - 447838 v2

Case No. 2:08-bk-10312-BB
Case No. 2:08-bk-10340-BB
Case No. 2:08-bk-10297-BB
Case No. 2:08-bk-10329-BB
Case No. 2:08-bk-10319-BB
Case No. 2:08-bk-10326-BB
Case No. 2:08-bk-10332-BB
Case No. 2:08-bk-10336-BB
Case No. 2:08-bk-10314-BB
Case No. 2:08-bk-10317-BB
Case No. 2:08-bk-10333-BB
Case No. 2:08-bk-10291-BB
Case No. 2:08-bk-10338-BB
Case No. 2:08-bk-10280-BB
Case No. 2:08-bk-10305-BB
Case No. 2:08-bk-10335-BB
Case No. 2:08-bk-10321-BB
Case No. 2:08-bk-10285-BB
Case No. 2:08-bk-10320-BB
Case No. 2:08-bk-10306-BB
Case No. 2:08-bk-10311-BB
Case No. 2:08-bk-10301-BB
Case No. 2:08-bk-10298-BB
Case No. 2:08-bk-10341-BB
Case No. 2:08-bk-10331-BB
Case No. 2:08-bk-10325-BB
Case No. 2:08-bk-10290-BB

| | |
|---|---|
| In re<br><br>Diversity MSP, Inc.,<br><br>      Debtor. | Case No. 2:08-bk-10376-BB<br><br>Chapter 7<br><br>Jointly Administered With Case:<br><br>Case No. 2:08-bk-10277-BB<br><br>Substantively Consolidated With Cases:<br><br>Case No. 2:08-bk-10372-BB<br>Case No. 2:08-bk-10316-BB<br>Case No. 2:08-bk-10373-BB<br>Case No. 2:08-bk-10375-BB |
| ☒    Affects Both Debtors | |
| ☐    Affects Axium International, Inc. | 2:08-bk-10277-BB |
| ☐    Affects Diversity MSP, Inc. | 2:08-bk-10376-BB |

LIMITED OPPOSITION OF UNITED
HEALTHCARE SERVICES, INC. TO CHAPTER 7
TRUSTEE'S MOTION FOR ORDER
AUTHORIZING SETTLEMENT OF CERTAIN
AVOIDANCE POWER CLAIMS WITHOUT
FURTHER NOTICE OR HEARING

\\\LA - 086335/000040 - 447838 v2

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE,**

**THE OFFICE OF THE UNITED STATES TRUSTEE, AND INTERESTED PARTIES:**

United HealthCare Services, Inc. ("UHS"), a creditor and party in interest in

the above-captioned Chapter 7 cases, by and through its undersigned counsel, hereby

opposes the Chapter 7 Trustee's Motion for Order Authorizing Settlement of Certain

Avoidance Power Claims Without Further Hearing or Notice Pursuant to Rule 9019(b) of

the Federal Rules of Bankruptcy Procedure (the "Motion") solely to the extent provided

herein.

Pursuant to Local Bankruptcy Rule 9013-1(f), any reply to this opposition

must be filed with the Court and served on counsel for UHS not later than 7 days prior to

hearing on the Motion.

I.

**INTRODUCTION AND BACKGROUND**

The above-captioned debtors (collectively, the "Debtors" and each a

"Debtor") commenced separate voluntary petitions for relief under Chapter 7 of Title 11 of

the United States Code (the "Bankruptcy Code") on or about January 8 and 9, 2008

(collectively, the "Petition Date"). Prior to the Petition Date, UHS and one of the Debtors

were parties to that certain Agreement for Centralized Vendor Management Services (the

"Vendor Management Agreement").[1]  Pursuant to the Vendor Management Agreement,

the Debtor provided services to UHS, including, without limitation, staffing, payrolling,

management and administration services. The Vendor Management Agreement

---

[1]    A redacted copy of the Vendor Management Agreement is attached to the
accompanying Declaration of Eric J. Noyes as Exhibit 1.

LIMITED OPPOSITION OF UNITED
HEALTHCARE SERVICES, INC. TO CHAPTER 7
TRUSTEE'S MOTION FOR ORDER
AUTHORIZING SETTLEMENT OF CERTAIN
AVOIDANCE POWER CLAIMS WITHOUT
—3—    FURTHER NOTICE OR HEARING

WLA - 086335/000040 - 447838 v2

1    contemplated two separate categories of service providers (collectively, the "UHS Service

2    Providers"):  (1) employees of the Debtor and/or employees of a subcontractor with which

3    the Debtor was to enter into a subcontractor agreement for services, and (2) vendors

4    identified as "Participating Vendors" in the Vendor Management Agreement with respect

5    to which the Debtor acted as merely the billing and paying agent.

6

7         The Chapter 7 Trustee has apparently sent numerous letters to third parties

8    (including UHS Service Providers) demanding payment of transfers received by such

9    third parties from the Debtor within ninety (90) days of the Petition Date, asserting that

10   such transfers are avoidable pursuant to Section 547 of the Bankruptcy Code.  In the

11   event that the Debtor made payments to third parties as a paying agent for UHS, such

12   payments may not be avoidable under Section 547 of the Bankruptcy Code if such

13   transfers do not involve property of the Debtor's estate.  However, the Chapter 7 Trustee

14   may have nonetheless demanded payment from such third parties, and such demand

15   could result in a settlement that may have an impact on UHS.

16

17        Pursuant to the Motion, the Chapter 7 Trustee is seeking the authority to

18   settle certain claims without further notice or court orders, including, without limitation,

19   claims against the UHS Service Providers.  UHS opposes the Motion *only to the extent*

20   *that it applies to the settlement of claims against the UHS Service Providers.*  UHS

21   hereby requests that it receive notice of any proposed settlement between the Chapter 7

22   Trustee and any of the UHS Service Providers in order to allow UHS to raise any

23   questions it may have regarding which category of service providers is involved, attempt

24   to resolve any disputes between the Chapter 7 Trustee and UHS over the proposed

25   settlement and, if necessary, file an objection to the proposed settlement with this Court.

26

27

28

LIMITED OPPOSITION OF UNITED
HEALTHCARE SERVICES, INC. TO CHAPTER 7
TRUSTEE'S MOTION FOR ORDER
AUTHORIZING SETTLEMENT OF CERTAIN
AVOIDANCE POWER CLAIMS WITHOUT
—4—    FURTHER NOTICE OR HEARING

1    UHS has no desire to substitute its business judgment for that of the Chapter 7 Trustee,

2    delay or decrease the efficiency of the approval of settlements that are beneficial to the

3    estate, increase costs and expenses of the estate associated with settlement or decrease

4
     potential recoveries.  However, the limited notice of and opportunity to object to proposed
5
6    settlements requested by UHS herein is imperative to protect UHS from the negative

7    effect that such settlements may have on UHS.

8                                                    II.

9                                              **ARGUMENT**

10
             Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides "[o]n
11
12   motion by the trustee after notice and a hearing, the court may approve a compromise or

13   settlement.  Notice shall be given to creditors, the United States trustee, the debtor, and

14   indenture trustees as provided in Rule 2002 and to any other entity as the court may

15   direct."  Fed. R. Bankr. P. 9019(a).  While the bankruptcy court has considerable

16   discretion in granting authority to compromise, there is an obligation to make an informed,

17   independent judgment that the compromise is fair and equitable and be apprised of all

18   relevant information when granting such authority.  See Woodson v. Fireman's Fund Ins.
19
20   Co., 839 F.2d 610, 620 (9th Cir. 1988) ("Although the bankruptcy court has great latitude

21   in authorizing a compromise, it may only approve a proposal that is 'fair and equitable.' ").

22   The Chapter 7 Trustee, as the proponent of the proposed settlements, has the burden of

23   establishing that the proposed settlements are fair and equitable and in the best interest

24   of the estate.  See In re Mickey Thompson Entertainment Group, Inc., 292 B.R. 415, 420
25
26   (9th Cir. BAP 2003).  In determining whether to authorize a settlement, the court should

27   not simply accept the trustee's word that a settlement is reasonable nor should a court

28   _____

LIMITED OPPOSITION OF UNITED
HEALTHCARE SERVICES, INC. TO CHAPTER 7
TRUSTEE'S MOTION FOR ORDER
AUTHORIZING SETTLEMENT OF CERTAIN
AVOIDANCE POWER CLAIMS WITHOUT
–5–    FURTHER NOTICE OR HEARING

WLA - 086335/000040 - 447838 v2

1    merely "rubber-stamp" the trustee's proposal.  See In re Roqumore, 393 B.R. 474, 480

2    (Bankr. S.D. Tex. 2008).

3          While Rule 9019(b) provides a mechanism to "pre-approve" settlements of

4    claim that might be too numerous for efficient administration under the requirements of

5

6    Rule 9019(a), the proposed settlements must still be fair and equitable.  Courts have

7    found that they have an "obligation to scrutinize the proposed settlement to ensure that it

8    is 'fair and equitable' to the persons who did not settle but who would nevertheless be

9    impacted by the settlement."  In re Selected Cases in which the Chapter 13 Trustee

10   Seeks Relief Against Countrywide Home Loans, Inc., 396 B.R. 138, 142 (Bankr. W.D.Pa.

11

12   2008), citing, In re Nutraquest, Inc., 434 F.3d 639, 645 (3d Cir. 2006).  "[T]he purpose of

13   Rule 9019 is to protect the interest of others who are not parties to the agreement and

14   whose rights may be affected."  Nelson Co. v. Amquip Corp. (In re Nelson Co.), 117 B.R.

15   813, 820 n. 19 (Bankr. E.D. Pa. 1991), aff'd, 128 B.R. 930 (E.D. Pa. 1991), aff'd, 959 F.2d

16   1260 (3d Cir. 1992).

17         As the UHS Service Providers were providing services to UHS pursuant to

18   the Vendor Management Agreement with the Debtor, the rights of UHS may be affected

19   by settlements that the Chapter 7 Trustee enters into with one or more of the UHS

20

21   Service Providers.  If the Motion is granted in its current form, UHS will have no way to

22   protect its interests and will be essentially stripped of its right to due process.  "An

23   elementary and fundamental requirement of due process in any proceeding which is to be

24   accorded finality is notice reasonably calculated, under all the circumstances to apprise

25

26   interested parties of the pendency of the action and afford them an opportunity to present

27   their objections."  Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70

28

LIMITED OPPOSITION OF UNITED
HEALTHCARE SERVICES, INC. TO CHAPTER 7
TRUSTEE'S MOTION FOR ORDER
AUTHORIZING SETTLEMENT OF CERTAIN
AVOIDANCE POWER CLAIMS WITHOUT
—6—    FURTHER NOTICE OR HEARING

1   S.Ct. 652, 657, 94 L. Ed. 865 (1950).  Accordingly, UHS respectfully requests that the

2   Motion be denied or be conditioned upon the Chapter 7 Trustee providing UHS with

3   notice and the opportunity to object to any proposed settlement with any of the UHS

4   Service Providers.

5

6                                                                     III.

7                                                          **CONCLUSION**

8          Based on the foregoing, UHS respectfully requests that the Chapter 7

9   Trustee's Motion for Order Authorizing Settlement of Certain Avoidance Power Claims

10  Without Further Hearing or Notice Pursuant to Rule 9019(b) of the Federal Rules of

11  Bankruptcy Procedure be denied to the extent that it does not provide UHS with notice of

12  and the opportunity to be heard regarding proposed settlements between the Chapter 7

13  Trustee and the UHS Service Providers.  The Chapter 7 Trustee should be required to

14  provide UHS with notice of and the opportunity to be heard concerning all proposed

15  settlements with any UHS Service Providers.

16  DATED: September 22, 2009

17

18                                     HOGAN & HARTSON LLP

19

20

21                          By: _Neil K. O'Hanlon_

22                              Neil R. O'Hanlon
                                *Attorneys for United HealthCare Services,
23                              Inc.*

24

25

26

27

28

LIMITED OPPOSITION OF UNITED
HEALTHCARE SERVICES, INC. TO CHAPTER 7
TRUSTEE'S MOTION FOR ORDER
AUTHORIZING SETTLEMENT OF CERTAIN
AVOIDANCE POWER CLAIMS WITHOUT
—7—  FURTHER NOTICE OR HEARING

\\\LA - 086335/000040 - 447838 v2

## DECLARATION OF ERIC J. NOYES

ERIC J. NOYES declares and states:

1.      I am the Director of Strategic Sourcing for United Health Group, Inc. United HealthCare Services, Inc. ("UHS") is its corporate contracting entity, and I was the person primarily responsible for administering on behalf of UHS the Amended and Restated Agreement for Centralized Vendor Management Services (the "Vendor Management Agreement") between Chimes, Inc. and UHS. I know the following of my own personal knowledge and would so testify if called upon to do so.

2.      A copy of the Vendor Management Agreement is attached as Exhibit 1. Certain provisions have been redacted to protect their confidentiality, and the schedules have also been omitted (except for one excerpt from Schedule B to the Vendor Management Agreement).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 22, 2009 at Minnetonka, Minnesota.

_____
ERIC J. NOYES

\\LA - 084335/000040 - 447734 v1

**EXHIBIT 1**

# AMENDED AND RESTATED AGREEMENT FOR CENTRALIZED VENDOR MANAGEMENT SERVICES

## CHIMES, INC.

### AND

## UNITED HEALTHCARE SERVICES, INC.

### EFFECTIVE DATE: 1/1/2007

**EXHIBIT 1**

9

# TABLE OF CONTENTS
## TO THE
## AGREEMENT FOR CENTRALIZED VENDOR MANAGEMENT SERVICES

ARTICLE I – BACKGROUND AND PARTIES

1.1.    Background

ARTICLE II – TERM

2.1.    Term

ARTICLE III – OBLIGATIONS OF THE PARTIES

3.1     Services
3.1.1   Assignment Orders
3.2.    Preferred Consultants
3.13.   Chimes' Obligations
3.14.   Consultants
3.15.   Continuous Improvement
3.16.   Account Management
3.17.   Consultant Continuity and Replacement
3.18.   Out-of-Scope Work
3.19.   Audits
3.20.   Compliance with U.S. Laws
3.21.   Compliance with Customer Personnel Policies
3.22.   Customer Data

ARTICLE IV – PAYMENT FOR SERVICES

4.1.    Service Charges
4.2.    Payments to Consultants
4.3.    Expenses
4.4.    Invoicing and Payment
4.5     ▉▉▉▉▉▉▉▉▉▉▉▉

ARTICLE V – RELATIONSHIP OF THE PARTIES

5.1.    Independent Contractor
5.2.    Consultants and Other Chimes Personnel
5.3.    Media Releases

ARTICLE VI – DISPUTE RESOLUTION

6.1.    Implementation
6.2.    Structure
6.3.    Process
6.4.    Meetings

ARTICLE VII – WARRANTIES

7.1.    Work Standards
7.2.    Personnel
7.3.    Inducements
7.4.    No Interference with Contractual Relationship
7.5.    Authority
7.6.    Performance
7.7.    Non-Infringement
7.8.    Customer's Rights
7.9.    Warranty Disclaimer

ARTICLE VIII – PROPRIETARY RIGHTS

8.1.    Intellectual Property Rights: Grant of Limited License
8.2.    Customer's Information
8.3.    Work Product
8.4.    Confidential Information
8.5.    Privacy and Security of Information/HIPPA
8.6.    Injunctive Relief

ARTICLE IX – INDEMNIFICATION

9.1.    Indemnification by Chimes
9.2.    Indemnification by Customer
9.3.    Indemnification Procedures
9.4.    Enjoined Materials

ARTICLE X – LIMITATION OF LIABILITY

10.1.    Direct Damages
10.2.    No Consequential Damages
10.3.    Limitation on Damages

ARTICLE XI – FORCE MAJEURE

*11*

ARTICLE XII – TERMINATION

12.1.    Termination for Convenience
12.2.    Termination for Cause by Chimes
12.3.    Termination for Cause by Customer
12.4.    Termination for Insolvency
12.5.    Transition Assistance
12.6.    Actions upon Termination
12.7.    Termination of an Assignment Order
12.8     Termination of a Specific Type of Consultant

ARTICLE XIII – TAXES

13.1.    Obligations
13.2.    Timeliness
13.3.    Defense Cooperation

ARTICLE XIV – GENERAL PROVISIONS

14.1.    Security and Safety
14.2.    Waiver
14.3.    Non-Solicitation
14.4.    Notices
14.5.    Binding Nature and Assignment
14.6.    Construction
14.7.    Insurance
14.8.    Counterparts
14.9.    Governing Law, Jurisdiction, and Venue
14.10.   Survival
14.11.   Compliance with United States Export Regulations
14.12.   Cumulative Remedies
14.13.   Modifications
14.14.   Exhibits
14.15.   Complete Agreement

TABLE OF SCHEDULES AND EXHIBITS

## AGREEMENT FOR CENTRALIZED VENDOR MANAGEMENT SERVICES

THIS AGREEMENT FOR CENTRALIZED VENDOR MANAGEMENT SERVICES ("Agreement") entered into as of this _____ day of _____, 2007 is between Chimes, Inc., ("Chimes") a wholly owned subsidiary of Computer Horizons Corp., a Delaware corporation having a place of business at 49 Old Bloomfield Avenue Mountain Lakes, NJ 07046, and United HealthCare Services, Inc. ("UHS" or "Customer"), a Minnesota corporation having an office at 9900 Bren Road E., Minnetonka. MN 55343.

WHEREAS, the parties previously entered into that certain Agreement of Centralized Vendor Management Services dated May 30, 2001 as amended (the "Prior Agreement") and the parties now desire to amend and restate such Prior Agreement as set forth herein;

WHEREAS, the parties previously entered into Assignment Orders under the Prior Agreement that are currently in force and effect as of the Effective Date and the parties desire that such Assignment Orders continue in accordance with each Assignment Order's existing terms, subject to the terms and conditions of this Agreement;

WHEREAS, Customer desires to obtain centralized vendor management services in connection with its use of systems consultants and Chimes desires to provide such services to Customer.

### DEFINED TERMS

| | |
|---|---|
| Alliance Council | An organization comprised of senior representatives from both parties. It will have responsibility for overseeing and monitoring the actions of all parties involved with the Program. Each party shall select its own representatives for the Alliance Council. |
| Candidate | A person introduced by Chimes to Customer under this Agreement with a view to that person undertaking an assignment for Customer and who has the requisite experience level and skill set. |
| Consultant | An individual providing Consulting Services hereunder. |
| CVM – Centralized Vendor Management | A staffing process to bring candidates to Customer. |
| Director | Individual assigned by Chimes to manage the Program. |
| Hiring Manager(s) | Customer employee responsible for selection of Consultant staffing. |
| Position Requirement | Vetted Vendor Consultant positions posted with the Project Office. |
| Project Office | An organization staffed by Chimes employees. which provides the CVM Services. |

*13*

| Right-to-Hire Consultant | Any Consultant hired as an employee by Customer pursuant to Section 14.3. |
| Service Fee | Hourly charge deducted from payment by Chimes to Vendors in accordance with Schedule B. |
| Staffing Specialist | Individual assigned by Chimes to interface with the Customer Hiring Managers in support of the placement of Consultants at the client location. |

NOW, THEREFORE, Customer and Chimes hereby agree as follows:

## 1.    ARTICLE I - BACKGROUND AND PARTIES

1.1.    **Background** - This Agreement, which includes all Exhibits, Schedules, Attachments and Assignment Orders, which shall be incorporated herein from time to time by the parties hereto, supersedes all prior oral or written communications concerning the subject matter of this Agreement between the parties and constitutes the entire Agreement with respect thereto between the parties, except as same may be amended in writing from time to time by the parties. For purposes of this Agreement, an "Assignment Order" shall mean a document setting forth the particular services to be provided by Chimes to Customer and the individuals assigned to perform such services, substantially in the form of Exhibit 2, which shall be attached to this Agreement and incorporated herein.

1.1.1. Chimes is a provider of centralized vendor management services and Chimes represents that by skill and experience it is qualified and capable of performing the services contemplated by this Agreement.

1.1.2. Chimes has provided services under that certain Agreement for Centralized Vendor Management Services, dated May 30, 2001, as amended (the "Prior Agreement") and the parties desire to amend and restate the Prior Agreement on the terms set forth herein.

1.1.3. In conjunction with and as a primary component of the services provided by Chimes pursuant to this Agreement, Chimes shall utilize its proprietary Consolidated Hiring Internet Management Efficiency System ("Chimes™") software ("Chimes System") for the benefit of Customer, and allow Customer to utilize the Chimes System for purposes related solely to this Agreement.

1.1.4. References to "Customer" shall include its Affiliates (defined as any entity directly or indirectly controlling, controlled by, or under common control with Customer.)

## 2.    ARTICLE II - TERM

2.1.    **Term** - The term of this Agreement will commence on the date first set forth above (the "Effective Date"), and shall continue until terminated by either party in accordance with this Agreement.

## 3.    ARTICLE III - OBLIGATIONS OF THE PARTIES

3.1    **Services** - During the Term (as defined herein), Chimes will provide to Customer, (a) vendors, selected by Customer and/or Chimes, to receive position requirements from the Chimes project office (the

"Subcontract Suppliers" or "Vendors") who will provide temporary personnel, including but not limited to technical personnel to perform programming and other information technology services, administrative temporary personnel, and financial and legal temporary personnel (the "Consulting Services") specified by UHS pursuant to Assignment Orders; (b) Vendors who will provide temporary personnel to provide professional services ("Professional Services") specified by UHS pursuant to Assignment Orders and agreed upon by Chimes; (c) Chimes employees ("Chimes Associates") who will provide temporary staffing services specified by UHS pursuant to Assignment Orders ("Payrolling Services" ); and (d) centralized vendor management services, which means the recruitment, management, and administration of the Vendors whose Consultants perform the Consulting Services (the "CVM Services" and, together with the Consulting Services and the Professional Services, the "Services"). The parties acknowledge and agree that all Services hereunder shall be provided in the United States and internationally as agreed to by the parties, initially including, but not limited to Ireland and India.

The Services will meet or exceed the performance standards set forth in Schedule A, as well as in accordance with Exhibit 1. Chimes will deliver such personnel through Vendors which have been pre-approved by Customer.

3.1.1  *Assignment Orders* - Assignment Orders may be entered into hereunder.  Customer, its parent company and any of their subsidiaries and affiliated companies may enter into Assignment Orders under this Agreement, and for purposes of any such Assignment Order shall be considered the "Customer" as that term is used herein.  The Assignment Order shall be used in the event that there are special circumstances surrounding the Consulting Services or the Professional Services to be provided by the Consultant. Assignment Orders should be uniquely numbered for identification and once signed on behalf of Customer and Chimes, will be incorporated into and form a part of this Agreement.  If there is a conflict between this Agreement and any Assignment Order, the terms of the Assignment Order will govern the provision of the Consulting Services or Professional Services involved.  Each Assignment Order should include a full and complete description of the Consulting Services or Professional Services to be performed, the materials to be produced, the schedule for completion of each of the foregoing, the applicable time and materials charges (or fixed fee, if applicable and agreed upon in writing by both parties), and such additional information as Customer and Chimes agree upon. Assignment Orders shall be deemed approved by Subcontract Supplier when Subcontract Supplier either submits an executed Assignment Order, responds electronically by clicking "approved", electronic signature, or by not responding within five (5) days of an Assignment Order being received. Chimes shall cause Consultants to provide Customer with status reports as specified in the applicable Assignment Order or as otherwise requested by Customer.  In addition, Chimes shall provide to Customer on a monthly basis a written report listing each Consultant providing Services to Customer, and the total length of time each Consultant has been providing any Services to Customer under this Agreement.

3.2.    Chimes shall ensure that all of the subcontract supplier agreements with the Vendors under this Agreement will be automatically assigned over to Customer immediately in the event this Agreement terminates for any reason.

3.3.    Chimes agrees it shall not make any material changes to any of the subcontract supplier agreements under this Agreement without first obtaining approval from Customer. In addition, Chimes agrees to pass through to all Vendors any material changes or amendments to the terms of this Agreement that may be made from time to time by the parties.

3.4.    In the event that Chimes does not earn monthly fees totaling ▆▆▆▆▆ from Service Fees as described in Schedule B, then the parties shall meet, within thirty (30) days of determining that Chimes is not going to obtain its financial objectives to determine a course of action for Chimes to meet its financial objectives hereunder, including but not limited to a reasonable increase in Service Fees, receipt of fees from Customer and/or a reasonable reduction of Chimes' personnel relative to the Customer's engagement. Chimes understands and agrees that this Agreement does not guaranty Chimes any certain amount of work, and that nothing in this Agreement shall be construed as to prohibit Customer from engaging contractors or consultants on its own apart from this Agreement, or through other vendors. Parties agree that in the event they are unable to agree on a course of action, such disagreement shall be escalated in accordance with Article 6.

3.5.    Chimes shall use its best efforts to negotiate subcontract agreements under this Agreement which include favorable terms such as discounts, free training, and other similar items.

3.6.    Chimes shall ensure that Customer has the ability and right to add or delete Subcontract Suppliers to/from the program under this Agreement, at will.

3.7.    Chimes shall ensure that its Subcontract Supplier Agreements under this Agreement do not guarantee that such Vendor will be on a preferred list, or that such Vendor will always receive an opportunity to bid on open requirements.

3.8.    Chimes shall ensure that individual candidates are submitted for only one open requirement at a time.

3.9.    Chimes shall provide Customer proof of payment of Vendors hereunder upon Customer's written request.

3.10.    Chimes shall assign each Consultant a unique number for identification purposes rather than use the Consultant's social security number.

3.11.    Chimes shall perform routine back ups of its system and all Customer specific data, and retain copies off site, as to ensure the safety of Customer's data.

3.12.    Chimes will, at its sole expense, establish and maintain (i) written business continuity plans for the Services and supporting facilities and (ii) written disaster recovery plans for critical technology and systems infrastructure and (iii) proper risk controls (collectively, the "Contingency Plans") to enable continued performance under this Agreement in the event of a disaster or other unexpected break in Services. Chimes will update and test the operability of any applicable Contingency Plan at least annually, and will implement each such plan upon the occurrence of a disaster event. As used herein, a disaster is defined as an unanticipated incident or event, including, without limitation, force majeure events, technological accidents, or human-caused events, that may causes a material service or critical application to be unavailable without any reasonable prediction for resumption, or that causes data loss, property damage or other business interruption without any reasonable prediction for recovery, within a commercially reasonable time period.    In the event of a disaster, Chimes shall implement such Contingency Plans.

*16*

3.13.   Chimes shall promptly notify Customer of any security problems or data integrity issues that occur for any customer using Chimes.

3.14.   *Consultants* - Chimes will use its best efforts to allocate the best available personnel to perform the Services, at all times acting in the best interest of Customer. In no event shall Chimes act in its own interest by allocating Consultants in a manner that will benefit Chimes, to the detriment of Customer. In the event Chimes wishes to assign a Chimes Employee providing CVM Services to Customer to another Chimes customer, Chimes will first obtain Customer's permission prior to any such reassignment. In no event shall Customer be obligated to provide such permission to Chimes. Chimes shall also ensure that its Subcontract Supplier Agreements also require Customer's permission prior to a Vendor reassigning a Consultant to another customer.

3.15.   *Continuous Improvement* – Chimes will use its best efforts to align itself with Customer's business practices and to continuously improve the quality of the Services by reducing its costs and increasing its efficiency, but, to the extent reasonably possible, without compromising the level of quality.

3.16.   *Account Management* - Chimes will assign an appropriate number of Chimes employees, (the number to be agreed upon by the parties), (the "CVM Directors"), approved by Customer, who will have primary operational responsibility for the Services, including all personnel used in performing Services, and will serve as Chimes' primary liaison with Customer. Customer shall have the right to request the replacement of the CVM Directors at any time, and Chimes shall replace the CVM Directors immediately upon such request. Customer will assign a Customer employee (the "Customer Account Manager") who shall be Customer's primary liaison with Chimes. CVM Personnel shall be dedicated to Customer, at no additional charge, and shall be located at Customer's designated sites, in Hartford, CT and in Minnetonka, MN. Chimes and Customer will periodically review program metrics to determine if additional on-site account management is needed. The engagement will be staffed accordingly based on need and as agreed to by both parties.

3.17.   *Consultant Continuity and Replacement* - Chimes will use its best efforts to ensure the continuity of personnel assigned to perform Consulting Services pursuant to any Assignment Order.   In the event that any Consultant is unsatisfactory to Customer, Customer may reject such Consultant, and, if requested by Customer, Chimes will furnish a suitable replacement as soon as reasonably practicable, but in no event later than thirty (30) days after notification of rejection. Customer will not be obligated to pay for Consulting Services performed by Consultants after they have been rejected by Customer. There will be no charge to Customer for any replacement personnel assigned by Chimes until Customer and Chimes agree that each such replacement has acquired the necessary orientation and background to make a productive contribution, but in no event more than eight (8) hours.   In addition, in the event Customer is not satisfied with a Consultant's performance within the first forty (40) hours of such Consultant's engagement, Customer shall not be responsible for any fees up to such first forty (40) hours.

3.18.   *Out-of-Scope Work* - Any work that the parties mutually determine is beyond the scope of this Agreement, based on objective criteria including the estimated number of person-hours involved in the proposed effort, the utility to Chimes of the result of such effort in performing work for other Chimes clients, and such other applicable objective criteria as the parties may agree, will be deemed as out-of-

/7

scope and the parties will mutually agree upon both the pricing and priorities for performance of such out-of-scope work. All such out-of-scope work will be documented by a Change Request form ("CR"), attached hereto as Exhibit 5.

3.19. *Audits* - Chimes will provide Customer and Customer's certified public auditors ("Auditors") access to any facility or area at which Chimes is providing Services and access to all records and reports with respect to the Services, including complete and accurate accounting records maintained by Chimes in accordance with generally accepted accounting principles. Such records shall include, but shall not be limited to, records relating to the invoicing by and payment of the Subcontract Suppliers, contracts with Subcontract Suppliers, payroll and payment records, attendance cards, time sheets, and job summaries. The cost of such audit shall be the responsibility of Customer, except as provided herein. Such access shall be for the purpose of verifying Chimes' and any Subcontract Supplier's compliance with this Agreement, and for the purpose of verifying the integrity of data owned by Customer, audits of maintenance practices and procedures, of general controls and security practices and procedures, of the efficiency of Chimes' operations, or any other audit necessary to enable Customer to meet applicable regulatory requirements. Chimes will provide to such Auditors any assistance that they reasonably require including installing and operating audit software. In the event that such audit indicates that Customer had paid at least five percent (5%) more than the correct charges for Services, Chimes will promptly reimburse Customer for all costs of the audit along with any monies found to be due to Customer. Customer shall be responsible to ascertain that the Auditors shall conduct any such audit in a manner which does not unreasonably delay, disrupt, or otherwise interfere with Chimes' performance of the Services hereunder. The rights and obligations set forth in this Section 3.19 shall survive for seven (7) years after the expiration or earlier termination of this Agreement. Chimes agrees to make any changes to its practices and procedures reasonably requested by Customer as a result of such audit.

3.20. *Compliance with U.S. Laws* – (a) Chimes represents and warrants that chimes and all Consultants shall abide by all federal, state, and local laws, regulations, and ordinances with respect to the Services provided hereunder including, but not limited to, (i) the U.S. Foreign corrupt Practices Act, and (ii) laws relating to Chimes' obligations as an employer regarding the health, safety and payment of its employees. Chimes' compliance shall also include identifying and procuring the required permits, certificates, approvals, and inspections in Chimes' performance under this Agreement and Chimes will be responsible for any fees, permits, payments, and taxes that may be required for Chimes' performance of its obligations under this Agreement. Without limiting the foregoing, Chimes represents, warrants and covenants that none of Chimes or is subsidiaries, and, to the knowledge of Chimes, no director, officer, agent, employee, Consultant, Subcontract Supplier or any other party acting on behalf of any of Chimes or its subsidiaries, (a) has used, offered to use, or promised to use any funds or things of value for any unlawful contribution, gift, entertainment, or any other unlawful payments or expenses relating to political activity, (b) has made, offered to make, or promised to make any unlawful contribution, gift, or any other payment of money or any thing of value to any foreign or domestic government official or employee, specifically including any official or employee of any instrumentality, company, or any other entity owned or controlled by an foreign or domestic government, or to any foreign or domestic political party or campaign or any candidate for foreign political office, and (c) will take or assist any other party to take any of the foregoing acts in connection with Chime's performance under this Agreement. UHS may terminate this agreement at its sole discretion at any time if UHS determines that any Chimes personnel, Consultant or Subcontract Supplier have breached this provision, or have otherwise engage in any action or conduct in violation of the FCPA or any other applicable anti-bribery or anti-corruption law or

*18*

regulation.

(b) Chimes warrants that each of the Consultants shall be authorized to work in the United States, and that Chimes shall, and shall cause each of the Subcontract Suppliers to, monitor the expiration dates of their respective Consultants' visas and work permits, if any. Chimes and not Customer shall be solely responsible for ensuring compliance with all laws and regulations relating hereto.

3.21. **Compliance with Customer Personnel Policies** – Chimes will promptly cause any individual expected to assist in the performance of Services under this Agreement to: (a) provide to Chimes a completed Exhibit 4 hereto, as same may be revised by Customer from time to time including both background information and fingerprint specimens; and (b) upon Customer's request, undergo drug testing. When requested by UHS, Chimes and not the Subcontract Suppliers shall perform Background Verification and Drug Screening (as required) for Consultants, Chimes Associates, Temporary Workers and/or consultants providing services outside the scope of the Chimes engagement in accordance with UHS specifications. The cost for performing the Background Verifications and Drug Testing shall be borne by UHS and will be billed directly by UHS Background Verification and Drug Testing provider.

Subcontract Supplier Background Investigations shall include: (i) check of felonies and misdemeanors (whether filed attached to felonies or filed separately) filed at federal, county, municipal or local government levels for the candidate's county addresses for the previous seven (7) year period, and (ii) a search of Office of Inspector General ("OIG") and General Services Administration ("GSA") databases for sanctions issued by the Department of Health and Human Services against individuals involved with Medicare payments. Chimes shall ensure that only individuals that have passed the Background Investigation be assigned to perform Services hereunder. Decisions as to whether or not an individual passes or fails, shall be determined in accordance with the Pre-Employment/Pre-Placement Screening Matrix, attached hereto as Exhibit 6. Chimes shall provide Customer confirmation that any and all Background Investigations have been completed and the resulting individual has passed or failed. Chimes acknowledges that Customer is relying upon Chimes to ensure that all individuals complete Exhibit 4, review the results based on Exhibit 4, and assign or reject individuals based upon such results. Chimes shall provide Customer copies of all completed Exhibit 4 documents only upon Customer's request. Notwithstanding anything to the contrary in this Agreement, Customer may require Chimes immediately to terminate the assignment of any individual performing Services under this Agreement if an individual expected to provide Services under this Agreement does not promptly provide complete information (and fingerprint specimens) as provided in Exhibit 4 or does not undergo drug testing as requested or if, in the sole judgment of Customer (a) the results of the background investigation are unsatisfactory, (b) any background information provided by such individual is inaccurate, (c) any background information provided by such individual cannot be verified, or (d) the results of the drug testing are unsatisfactory. Nothing contained in this Agreement shall be construed to create any obligation on the part of Chimes to disclose to Customer or its personnel, any Subcontract Supplier, or any Consultant the reasons for its determination in this regard, or share any information obtained through its background investigation, except to the extent otherwise required by law.

3.22. *Customer Data* - Upon Customer's request, Chimes will promptly provide in Microsoft Excel format, either on disk or electronically as specified by Customer, all data relating to Consultants and Services provided to Customer hereunder that are particular to Customer. For the avoidance of doubt,

provision of such data by Chimes to Customer pursuant to this Section 3.22 shall not be deemed out-of-scope pursuant to Section 3.18. All such data shall belong to Customer, and Chimes shall use such data solely for performing its obligations under this Agreement.

## 4.    ARTICLE IV - PAYMENT FOR SERVICES

4.1.    *Service Charges* – Chimes shall be compensated for Services performed on behalf of Customer in accordance with the terms of this Article IV and Schedules C, D, E, and F. The applicable time and materials charges (or fixed fees, if applicable and agreed upon in writing by both parties) shall be specified in each Assignment Order. Work deemed to be out-of-scope and which Chimes performs at the written request of Customer will be paid by Customer at rates agreed to in an Assignment Order, or, if the Assignment Order does not specify rates pertaining specifically to such out-of-scope services, at rates mutually agreed upon in writing.

4.2.    *Payments to Consultants* - Consultants may be either employees of Chimes or employees of the Subcontract Supplier (or of such vendors' permitted subcontractors, as provided in Section 5.2) with whom Chimes has entered into a subcontractor agreement for such services in the form attached hereto as Attachment A ("Subcontract Supplier Agreement or applicable service agreement). Attachment A represents the list of different supplier agreements which may apply to the Subcontract Supplier depending on the nature of their services to Customer. Chimes shall ensure that each Subcontract Supplier shall appoint an account manager to oversee the performance of Consulting Services by such Subcontract Supplier's Consultants. Chimes will be solely responsible for all compensation or other payments due to any Consultant or Subcontract Supplier recruited by Chimes to provide Consulting Services to Customer, and shall act as billing and paying agent with respect to any Participating Vendors, as defined in Schedule B, as may be requested by Customer; provided however, Chimes shall not be obligated to make any payment to any Vendor unless and until Customer shall have made prior payment to Chimes for the applicable Consulting Services in accordance with the procedures described in Section 4.4. The immediately preceding sentence shall only apply to those payments Customer is obligated to make under this Agreement.

4.3.    *Expenses* - Except as expressly stated otherwise in this Agreement, Chimes will be entitled to reimbursement from Customer for all reasonable travel expenses required and actually incurred in connection with providing Services under this Agreement, provided that Chimes has: (a) obtained Customer's prior written consent; (b) detailed such expenses on a form acceptable to Customer and approved such expenses as being in accordance with Customer's expense policies; and (c) submitted supporting documentation satisfactory to Customer. It is understood that Customer shall not reimburse Chimes for normal commutation expenses or for travel and living expenses incurred by any Consultant or other Chimes personnel in performing Services at a Customer facility located in the same metropolitan area as that of such personnel's home base. It is also understood that any air transportation reimbursable hereunder shall be coach-economy and that any entertainment by or on behalf of Chimes or any Consultant shall be at no cost to Customer.

4.4.    *Invoicing and Payment* -- (a) Unless another payment schedule is specified on the applicable Assignment Order, in accordance with Schedule E, Chimes shall invoice Customer monthly in arrears for Consulting Services provided on a time and materials (or fixed fee, if applicable and agreed upon in writing by both parties) basis and for out-of-pocket expenses approved in writing by the Hiring Manager. Chimes will submit itemized invoices to Customer on a monthly basis for Consulting Services provided in

20

the prior calendar month. All such invoices will reference each individual Assignment Order. Payment will be made via electronic wire transfer within four (4) business days of receipt of a proper, undisputed invoice, unless otherwise excused by this Agreement. If Customer questions any invoice, it may withhold payment of the disputed amount until satisfied with the validity and accuracy of the invoice. Customer will pay the undisputed amount of any disputed invoice as if the undisputed part was a separate invoice. Customer shall remit payment directly to Chimes for all Consulting Services performed.

(b) In its capacity as billing and paying agent for any Participating Vendor identified by Customer, Chimes shall invoice Customer monthly in arrears for consulting services provided on a time and materials basis by such Participating Vendor. Chimes will submit electronically itemized invoices to Customer on a monthly basis for consulting services provided by all such Participating Vendors in the prior calendar month. Payment will be made via electronic wire transfer within four (4) business days of receipt of a proper, undisputed invoice unless otherwise excused by this Agreement. If Customer questions any invoice, it may withhold payment of the disputed amount until satisfied with the validity and accuracy of the invoice. Customer will pay the undisputed amount of any disputed invoice as if the undisputed part was a separate invoice. Customer shall remit payment directly to Chimes for all consulting services performed by consultants of Participating Vendors for which Chimes is acting as billing and paying agent. Chimes shall, within five (5) days of receipt of payment from Customer, pay the Participating Vendors for the work performed for Customer.

(c) Within ninety (90) days after termination or expiration of this Agreement and following the final payment cycle, Chimes shall submit to Customer a final, accurate invoice for any and all outstanding amounts due to Chimes under this Agreement by Customer. Customer shall not be liable for any invoices submitted to Customer by Chimes after the aforementioned ninety (90) days.

Chimes represents and warrants that all of the financial terms under this Agreement are equal to or more favorable than the terms being offered by Chimes, since execution of this Agreement, to any other customer in Customer's industry, geographic location and those customers which are similarly situated to Customer with respect to the CVM Services including size and scope of engagement. If, during the term of this Agreement, Chimes authorizes arrangements with any other customer that provide more favorable financial terms, Chimes shall notify Customer immediately and the parties shall execute an Amendment to this Agreement which shall incorporate the same terms.

REDACTED

21

# REDACTED

**5.     ARTICLE V - RELATIONSHIP OF PARTIES**

5.1.    *Independent Contractor* - The parties intend to create an independent contractor relationship and nothing contained in this Agreement shall be construed to make either Customer or Chimes partners, joint venturers, principals, agents, or employees of the other; provided, however, that the foregoing shall not be construed as preventing Chimes from performing any of its obligations under this Agreement. Neither party shall have any right, power, or authority, express or implied, to bind the other. The Consultants recruited by Vendors to provide Consulting Services for Customer shall be either employees of Subcontract Suppliers or of such Subcontract Suppliers' Permitted Subcontractors, and shall perform Consulting Services for Customer as subcontractors of Chimes. For purposes of this Agreement, "Permitted Subcontractors" shall mean any corporation that (a) is duly incorporated and in good standing in any of the United States, (b) is the employer of two or more employees, and (c) meets any further criteria that either Chimes or Customer, in each case in its sole discretion, may require. In no event shall any such Consultant be regarded as an employee of Customer.

5.2    *Consultants and Other Chimes Personnel* - Chimes agrees and represents that it is an independent contractor and that neither the Consultants nor its personnel who perform the Services hereunder are Customer's agents or employees for federal, state, and local tax purposes or any other purposes whatsoever, and are not entitled to any Customer employee benefits. Chimes assumes sole and full responsibility for the acts of the Consultants and its personnel who perform the CVM Services hereunder, specifically excluding Participating Vendors, and shall defend, indemnify and save harmless Customer, Customer's affiliates, and their successors, officers, directors, agents and employees ("Indemnitees") from loss, liability, costs, claims, judgments, awards and expenses (including reasonable attorneys' fees) relating to or arising out of any act or lack of action on the part of Chimes, any Consultant, or any of Chimes' personnel who perform the CVM Services hereunder, including but not limited to any liability or damages resulting from breach of any duty or theft of material or services by any such person, provided however, that Chimes' obligation to indemnify shall not apply to any loss or liability caused solely by the misconduct or negligence of Customer's employees or of other individuals not Consultants or Chimes personnel. Notwithstanding the foregoing, Chimes shall defend, indemnify and hold harmless Indemnitees with respect to claims, losses, costs, judgments, awards, expenses or liabilities of any kind (including reasonable attorneys' fees) relating to or arising out of any assertion that Indemnitees should be deemed the "employer" or "joint employer" of any of the individuals performing Services under this Agreement, specifically excluding Participating Vendors. Chimes represents that each of its personnel providing Services under this Agreement is an employee of Chimes or an employee of a Subcontract Supplier or such Subcontract Supplier's Permitted Subcontractor and that Chimes will withhold and pay, and cause the Subcontract Suppliers and any Permitted Subcontractors to withhold and pay, all applicable

*22*

income and payroll taxes with respect to such personnel. Chimes and not Customer is solely responsible to do, and to cause the Subcontract Suppliers and any Permitted Subcontractors to do, the following: (a) compensate the Consultants and other Chimes personnel performing Services hereunder; (b) pay workers compensation, disability, and other similar benefits, unemployment and other similar insurance; (c) withhold and pay income and payroll taxes; and (d) verify the work eligibility of each individual performing Services hereunder, including completing and maintaining Form I-9 for each such individual. Chimes will comply with all applicable requirements set forth in the attached Exhibit 4. Customer agrees and represents that each of the Participating Vendors is a vendor of Customer and not of Chimes, except where Participating Vendor has executed a Participating Vendor Agreement with Chimes. Except where the Participating Vendor Agreement states otherwise, it is the responsibility of Customer to secure all appropriate documentation from each Participating Vendor with respect to such Participating Vendor's consultant personnel. Unless Participating Vendor executed a Participating Vendor Agreement, as between Customer and Chimes, Customer, and not Chimes, is solely responsible for causing the Participating Vendors to do the following: (a) compensate the Participating Vendor consultant personnel; (b) pay workers compensation, disability, and other similar benefits, unemployment and other similar insurance for the Participating Vendor consultant personnel; (c) withhold and pay income and payroll taxes for the Participating Vendor consultant personnel; and (d) verify the work eligibility of each Participating Vendor consultant performing Services hereunder, including completing and maintaining Form I-9 for each such Participating Vendor consultant. Upon reasonable request by Chimes, Customer agrees to provide Chimes with all such documentation relative to the consultant personnel of a Participating Vendor with respect to which Chimes is acting as billing and paying agent hereunder, subject to any confidentiality restrictions. Except if the Participating Vendor Agreement states otherwise, (i) Participating Vendors will not be subject to any of the UHS discounts, including but not limited to, Volume and Overtime Discounts, in accordance with Schedule D; (ii) Participating Vendors will not receive any new requirements or access to the Chimes Vendor Site; and (iii). Chimes will not indemnify UHS or assume any liability on the deliverable as it relates to Participating Vendor. Chimes' sole obligation as it relates to the Participating Vendors is to act solely as a billing and paying agent under the terms and conditions of the Agreement, to provide the Participating Vendors access to CTE for entry of time for services rendered.

5.3.    *Media Releases* - All media releases, public announcements, and public disclosures by either party, or their respective employees, representatives, or agents, relating to this Agreement or the subject matter of this Agreement, or using the other party's name, including promotional or marketing material, but not including any announcement intended solely for internal distribution by such party or any disclosure required by legal, accounting, or regulatory requirements beyond the reasonable control of such party, will be coordinated with and approved in writing by the other party in its reasonable discretion prior to release. In no event shall either party be obligated to approve any such releases.

## 6.    ARTICLE VI - DISPUTE RESOLUTION

6.1.    *Implementation* - With respect to all disputes arising out of or relating to this Agreement, Chimes and Customer agree to implement a dispute resolution process as described in this Agreement (the "Dispute Resolution Process").

6.2.    *Structure* - The Alliance Council will comprise the decision-making body of the Dispute

Resolution Process.

6.3.    *Process* - All disputes between the parties ("Disputes"), which are not resolvable within the day-to-day working relationship of the parties, may be assigned by either party to the Alliance Council for resolution. The Alliance Council will meet to consider the issues not later than fourteen (14) calendar days after assignment to it. Such meetings may be telephonic. All issues requiring this type of resolution will be recorded in Chimes such that the record of progress toward resolution may be monitored by the Alliance Council. In the event any Dispute is not resolved by the Alliance Council within thirty (30) calendar days of the first meeting of the Alliance Council concerning such Dispute (or such other period mutually agreed by the parties), either party may seek any available legal relief. This Section 6.3 shall not affect either party's right to seek injunctive or other provisional relief at any time.

6.4.    *Meetings* - The Alliance Council shall meet periodically, or as required, during the Term for the purpose of overseeing the performance of this Agreement.

7.    **ARTICLE VII – WARRANTIES**

7.1.    *Work Standards* - Chimes represents and warrants to Customer that all Services rendered hereunder will be performed in a professional and workmanlike manner in accordance with the highest industry standards and practices applicable to the performance of such Services and will conform to Customer's requirements hereunder as well as any specifications and/or acceptance criteria, if applicable, identified in the Assignment Order. In the event such Services do not meet the specifications and/or acceptance criteria, if applicable, in the Assignment Order, such Services shall be performed at no additional cost until such specifications and criteria are met. In the event of a dispute of the quality of the work of a Consultant providing Professional Services, UHS shall resolve the dispute directly with the Consultant.

7.2.    *Personnel* - Chimes represents and warrants that the Consultants and other personnel it assigns to perform Services for Customer under this Agreement are qualified individuals with the proper training, experience, background, and skill to perform such Services.

7.3.    *Inducements* - Chimes warrants and represents that Chimes has neither provided nor offered to provide any gifts, payments, or other inducements to any officer, employee, or agent of Customer for any purpose.

7.4.    *No Interference with Contractual Relationship* - Each party represents and warrants to the other party that it is not subject to any contractual obligation that would prevent it from entering into this Agreement, and that Chimes' offer to provide the Services to Customer and Customer's acceptance of such offer in no way caused or induced either party to breach any contractual obligation.

7.5.    *Authority* - Chimes represents and warrants that it has full rights and authority to execute and deliver this Agreement and perform its obligations hereunder.

7.6.    *Performance* - Chimes represents and warrants that the Services shall be performed in accordance with this Agreement.

24

7.7.    *Non-Infringement* - Chimes represents and warrants that no deliverable, information, materials, performance of Services, or other Work Product (as hereinafter defined) provided hereunder, or the use thereof, or process or methodology used in performing the Services, infringes or shall infringe on any third party's intellectual property rights or contractual rights and Customer shall receive free and clear title to all works, materials, information, deliverables, and other Work Products prepared or developed in connection with this Agreement.

7.8.    *Customer's Rights* - Chimes represents and warrants that Customer shall have the right to use for its own purposes, any ideas, methods, techniques, materials, and information provided to or otherwise obtained by Customer as a result of this Agreement without restriction, liability, or obligation, except as may be specified herein.

7.9    *Warranty Disclaimer* - The warranties set forth in this Agreement and in an Assignment Order, if applicable, attached hereto as Exhibit 2, constitute the only warranties provided by either party with respect to this Agreement, and such warranties are in lieu of all other warranties, written or oral, statutory, expressed or implied, including the warranty of merchantability and the warranty of fitness for a particular purpose.

## 8.    ARTICLE VIII - PROPRIETARY RIGHTS

8.1.    *Intellectual Property Rights; Grant of Limited License* - All intellectual property rights, including patent, copyright, and trademark relative to the Chimes software utilized by Chimes to perform the Services herein will be owned solely by Chimes. The utilization of the Chimes software by Chimes in the performance of Services pursuant to this Agreement shall not be interpreted to convey any right, title, license, or entitlement of continued possession or use of such software to Customer.

8.2.    *Customer's Information* -Information and data relating to Customer and its clients, customers, members, providers, vendors, claims data, employees, consultants, representatives, and agents, including financial, statistical, personnel, technical data, marketing information, manufacturing data and processes, product information, projects and other information regarded as confidential or proprietary by Customer, that is contained in software programs accessed by Chimes or is otherwise disclosed to or accessible by Chimes, in connection with this Agreement ("Customer Information"), are the property of Customer and Chimes hereby agrees (and will require all Subcontract Suppliers to agree in writing to agree) to use such Customer Information solely for purposes of providing Services to Customer under this Agreement. Customer Information shall also include all information contained in the database maintained by the CVM Project Office utilizing the Chimes software. Upon Customer's request at any time, and upon the expiration or earlier termination of this Agreement for any reason, Chimes shall immediately deliver to Customer at Chimes' expense, any or all of the Customer Information, in the form requested by Customer. Chimes shall not possess any interest, title, lien or right to any such Customer Information.

8.3.    *Work Product* - Chimes acknowledges and agrees that Customer shall have exclusive, unlimited ownership rights to all results of any Consulting Services performed under this Agreement, including any and all software (including object and source code), deliverables, computer system designs, documentation, know-how, trade secrets, inventions (whether or not patentable or reduced to practice), improvements, processes, developments, materials, or data that the Consultants make, conceive, or devise,

*25*

either solely or jointly, both as individual items and/or a combination of components, as a result of Consulting Services performed under any Assignment Order (whether or not such Assignment Order is completed) (collectively, the "Work Product"), to the maximum extent permitted by law. All the foregoing shall be deemed to be a work made for hire and made in the course of the Services rendered hereunder. All right, title, and interest in and to the Work Product shall vest in Customer, and neither Chimes, nor any Subcontract Supplier or Consultant shall have any right, title, or interest in or to such Work Product. To the extent that title to any Work Product may not, by operation of law, vest in Customer or such Work Product may not be considered work made for hire, all right, title, and interest therein is hereby irrevocably assigned to Customer to the maximum extent permitted by law. Chimes further agrees to cause each of the Subcontract Suppliers to similarly assign to Customer all such right, title and interest in and to the Work Product to the maximum extent permitted by law as a condition of performing Services for Customer. All Work Product shall belong exclusively to Customer, with Customer having the right to obtain and to hold in its own name, copyrights, registrations, or such other protection as may be appropriate to the subject matter, and any extensions and renewals thereof. Chimes agrees to give, and to require the Subcontract Suppliers and Consultants to give Customer and any person designated by Customer reasonable assistance, at Customer's expense, required to perfect the rights defined in this Section. Unless otherwise requested by Customer, upon the completion of the Consulting Services to be performed under each Assignment Order or upon the earlier termination of such Assignment Order, or at Customer's request, Chimes shall cause each Consultant to immediately turn over to Customer all Work Product, and all copies thereof, developed pursuant to such Assignment Order. All Work Products reduced to tangible form, including any deliverables, shall bear Customer's copyright and trade secret notices, or such other proprietary notice as Customer may specify. Chimes shall not possess any interest, title, lien, or right to any such Work Product.

Chimes shall cause each Consultant to promptly make a complete written disclosure to Customer of each invention, discovery, device, or procedure whether patentable or not (hereinafter referred to as "Disclosed Subject"), conceived or first actually reduced to practice, solely or jointly, by such Consultant and/or Customer as a result of services performed hereunder. As to each such Disclosed Subject, Consultant shall specifically point out the features or concepts which Consultant believes to be new or different.

8.4.    *Confidential Information* - Each party agrees that during the course of this Agreement, information that is non-public or proprietary may be disclosed by such party (the "Disclosing Party"), to the other party (the "Receiving Party"), including, but not limited to trade secrets, methodologies, supplier lists, data, including cost and price data, software, computer and telecommunications systems, records, technical processes and formulas, product designs, sales, unpublished financial information, product and business plans, usage rates, projections, marketing data and memoranda, papers, letters, e-mail, notes, plans, documentation, records, and all copies thereof relating to past, existing, or planned business or technology of the Disclosing Party or of the Disclosing Party's clients or customers, member, employee, provider, vendor information, and claims data ("Confidential Information"). Customer Information (as defined in Section 8.2), Confidential Information of Customer Affiliates and all Work Products hereunder, software in source code or object code, deliverables, processes, specifications, or data developed by any Consultant in connection with this Agreement shall be the Confidential Information of Customer. The terms and conditions of this Agreement shall be the Confidential Information of both parties. Confidential Information shall not include information that the Receiving Party can demonstrate: (a) is publicly

26

disclosed by the Disclosing Party either prior to or subsequent to the receipt by the Receiving Party of such information; (b) was known to the Receiving Party as of the time of its disclosure free from any obligation to keep such information confidential as demonstrated by its written records maintained in the ordinary course of business or actual prior use; (c) is independently developed by the Receiving Party without access to the Confidential Information of the Disclosing Party; (d) is rightfully obtained from a third party lawfully in possession of the Confidential Information and not under a confidentiality obligation to the Disclosing Party; or (e) is required by law to be disclosed by such party; provided the Receiving Party, where reasonably practicable and to the extent legally permissible, provides the Disclosing Party with prior written notice of such required disclosure. The Receiving Party shall hold all the Disclosing Party's Confidential Information in trust and confidence for the Disclosing Party, its subsidiaries, and affiliates. Except as may be authorized by the Disclosing Party in writing, the Receiving Party shall not disclose to any person, firm, or enterprise, or use for its own benefit, any such Confidential Information, and even when so authorized by the Disclosing Party, the Receiving Party shall limit access and disclosure to the Receiving Party's personnel on a "need to know" basis only. Chimes shall implement and maintain appropriate security procedures to protect the Customer Confidential Information from inadvertent or unintended disclosure or access. Chimes agrees that Customer may disclose Confidential Information to consultants performing services for Customer's benefit, provided that such consultants are bound by confidentiality obligations at least as restrictive as those set forth in this Agreement. All Consultants shall comply with the confidentiality obligations set forth herein and Chimes shall be fully responsible for Consultants' compliance with the confidentiality obligations set forth herein and any breach thereof.

Chimes shall, in advance, require. (before Services are provided) each individual assigned to perform Consulting Services under any Assignment Order and each individual who obtains or is in a position to obtain any Customer Information or material that is Confidential Information. to execute a Contingent Worker User Guide and Agreement in the form attached hereto as Exhibit 4, which forms a part hereof. Chimes will provide Customer with a true copy of each such Contingent Worker User Guide and Agreement upon request. Chimes further agrees to take any other steps reasonably required and/or appropriate to ensure compliance with the obligations set forth herein.

8.5    *Privacy and Security of Information/HIPAA Requirements.*    Chimes agrees to comply, HIPAA/GLB Compliance attached hereto as Exhibit 8.

8.6.    *Injunctive Relief* - Each party acknowledges that unauthorized disclosure of the other's Confidential Information will cause irreparable injury to the Disclosing Party, which injury shall be inadequately compensable in damages. Accordingly, the Disclosing Party may seek and obtain injunctive relief against the breach or threatened breach of the Receiving Party's confidentiality obligations hereunder, in addition to any other legal or equitable remedies which may be available.

9.    **ARTICLE IX – INDEMNIFICATION**

9.1.    *Indemnification by* **Chimes** - Except for claims from or arise out of the provision of Professional Services by Suppliers and their Consultants and Chimes Associates, related to the medical field, whether clinical or non-clinical (collectively "Medical Field"), Chimes agrees, at its own expense. to indemnify, defend, and hold harmless Customer and its parent. subsidiaries. affiliates, directors, officers, employees,

27

and agents against any and all losses, liabilities, judgments, awards, and costs (including attorneys' fees and expenses) arising out of or relating to:

(a) any claim by a third party that any deliverables, Work Product materials and/or services furnished to or obtained by Customer pursuant to this Agreement or use thereof by Customer infringe any patent, copyright, trademark, trade secret, license, or other proprietary right of any third party;

(b) any claim on account of any act or lack of action on the part of Chimes, its employees, representatives, or agents, or any of the Subcontract Suppliers, Permitted Subcontractors, or their respective employees, representatives, or agents, including the Consultants, including but not limited to any liability or damages resulting from breach of any obligation, representation or warranty under this Agreement, duty or theft of material or services by any such person, or for personal injury (including death) or damage to property arising out of any act or omission, negligent or otherwise, to the extent caused by Chimes, its employees, representatives, or agents, or any of the Subcontract Suppliers, Permitted Subcontractors or their respective employees, representatives, or agents, including the Consultants; provided however that Chimes' obligation to indemnify pursuant to this Section 9.1(b) shall not apply to any loss or liability caused solely by the misconduct or negligence of Customer's employees or of other individuals not directly employed or engaged by Chimes or any Subcontract Supplier;

(c) Except for claims  from or arise  out of Professional Services Suppliers and their Consultants and Chimes Associates, who provide Services related to the medical field, whether clinical or non-clinical (collectively "Medical Field"), any claim under any labor, employment, employee benefit, tax, or other laws or regulations of the United States or of any State arising out of any action or inaction of Chimes, its employees, representatives or agents, or any Subcontract Supplier, Permitted Subcontractor or their respective employees, representatives, or agents; provided, however, that Chimes shall not be liable under this clause (c) of Section 9.1 to the extent, but only to the extent, that it is determined in a final and nonappealable judgment by a court of competent jurisdiction that such loss, liability, judgment, award, or cost resulted directly from Customer's willful misconduct;

(d) Except for claims  from or arise  out of Professional Services Suppliers and their Consultants and Chimes Associates, who provide Services related to the medical field, whether clinical or non-clinical (collectively "Medical Field"), any claim for payment of compensation (including benefits) or salary asserted by any Subcontract Supplier, Permitted Subcontractor, any Consultant, or any government agency and any other liabilities, costs, and expenses (including, but not limited to, attorneys' fees) associated with a determination by any Federal, state, or local government agency, any court, or any other applicable entity that the personnel provided by Chimes or a Subcontract Supplier or a Permitted Subcontractor are employees of Customer for any purpose; provided, however, that Chimes shall not be liable under this clause (d) of Section 9.1 to the extent, but only to the extent, that it is determined in a final and nonappealable judgment by a court of competent jurisdiction that such loss, liability, judgment, award, or cost resulted directly from Customer's willful misconduct; or

9.2    *Indemnification by Customer* - Customer agrees, at its own expense, to indemnify, defend, and hold harmless Chimes and its parent, subsidiaries, affiliates, directors, officers, employees, and agents against any and all losses, liabilities, judgments, awards, and costs (including reasonable attorneys' fees and expenses) arising out of or relating to (a) any claim under any labor, employment, employee benefit,

UHG 2007 CVM Renewal FINAL 1-18-07 doc

tax, or other laws or regulations of the United States or of any State arising out of any willful misconduct of Customer or its employees. and (b) any claims relating to personal injury claims. third party claims, labor, employment or other laws or regulations of the US or of any State from or arising out of Services rendered by Professional Service Vendors.

9.3    *Indemnification Procedures* – The party seeking indemnification under this Article IX (the "Indemnified Party") shall notify the other party (the "Indemnifying Party") promptly after the Indemnified Party receives notice of a claim for which indemnification is sought under this Agreement, provided, however, that no failure to so notify the Indemnifying Party shall relieve the Indemnifying Party of its obligations under this Agreement except to the extent that it can demonstrate damages directly attributable to such failure. The Indemnifying Party shall have authority to defend or settle the claim; provided however that the Indemnified Party, at its sole discretion and expense, shall have the right to participate in the defense and/or settlement of the claim, and provided further. that the Indemnifying Party shall not settle any such claim imposing any liability or other obligation on the Indemnified Party without the Indemnified Party's prior written consent.

9.4    *Enjoined Materials* - Chimes agrees that should Customer's use of any Work Product, deliverable and/or other material furnished to Customer by Chimes, any of its subcontractors, or by any Consultant be enjoined by any court, Chimes shall promptly obtain, at no expense to Customer, the right for Customer to continue to use the items so enjoined or, at no expense to Customer, provide Customer promptly with substitute items that are functionally equivalent to the enjoined products. The foregoing shall be in addition to, and not in limitation of, any other remedies available to Customer in law or equity.

## 10.    ARTICLE X - LIMITATION OF LIABILITY

10.1.    *Direct Damages* - Each party shall be liable to the other for any direct damages arising out of relating to a breach of this Agreement. The following shall be considered examples of (but in no event shall be construed as being conclusive) direct damages to Customer, and Chimes shall not assert that they are indirect. incidental. special. or consequential damages or lost profits: (a) monies paid or payable by Customer under this Agreement; (b) costs incurred as a result of implementing a mitigating solution; (c) costs of reconstituting lost or corrupted Customer data, third party data or Confidential Information of Customer; and (d) costs and expenses related to diverted Customer management time.

10.2.    *No Consequential Damages* - Neither party shall be liable to the other for any punitive, indirect, incidental. special. or consequential damages or lost profits; provided however that such limitation of liability shall not apply to: (a) Chimes' indemnification obligations hereunder; (b) damages arising out of Chimes' breach of its confidentiality obligations hereunder; or (c) claims arising from the liable party's gross negligence or willful misconduct.

10.3.    *Limitation on Damages* - The liability of one party to the other hereunder for direct damages shall not exceed ▪▪▪▪▪▪▪▪, provided however that such limitation of liability shall not apply to: (a) Chimes' indemnification obligations hereunder; (b) damages arising out of Chimes' breach of its confidentiality obligations hereunder or its failure to comply with laws: or (c) claims arising from the liable party's gross negligence or willful misconduct.

*29*

## 11.   ARTICLE XI - FORCE MAJEURE

11.1.   If and to the extent that either party's performance of any of its obligations pursuant to this Agreement is delayed by revolution or other civil disorders, wars, acts of enemies, fires, floods, acts of God, federal, state or municipal action, statute, ordinance or regulation, or any other cause beyond the reasonable control of such party (each, a "Force Majeure Event"), and such non-performance could not have been prevented by reasonable precautions, then the non-performing party shall be excused from any further performance of those obligations for so long as such Force Majeure Event continues and such party continues to use its best efforts to recommence performance whenever and to whatever extent possible without delay, including through the use of temporary alternate sources, temporary work around plans, or other means. The party whose performance is delayed by a Force Majeure Event shall immediately notify the other party by telephone or other expeditious means of the occurrence of the Force Majeure Event and describe in reasonable detail the nature of the Force Majeure Event and the expected duration of the delay (to be confirmed in writing within two (2) days of the inception of such delay). If any delay by Chimes to perform any of its obligations under this Agreement due to a Force Majeure Event continues for a period of thirty (30) days or more, Customer shall have the right to terminate this Agreement, without the payment of any fees or penalties.

## 12.   ARTICLE XII – TERMINATION

12.1.   *Termination for Convenience* - Customer may terminate this Agreement at its convenience for any or no reason by giving Chimes written notice of such termination at least ninety (90) days prior to the effective date of such termination.

12.2.   *Termination for Cause by Chimes* - Chimes shall have the right to terminate this Agreement if Customer materially breaches this Agreement and fails to cure such breach within thirty (30) days after receiving written notice from Chimes specifying such default.

12.3.   *Termination for Cause by Customer* - Customer shall have the right to terminate this Agreement if Chimes materially breaches this Agreement and fails to cure such breach within thirty (30) days after receiving written notice from Customer specifying such default.

12.4.   *Termination for Insolvency* - A party will be deemed in breach of this Agreement if such party becomes or is declared insolvent or bankrupt, is the subject of any proceedings relating to its liquidation or insolvency, or for the appointment of a receiver, conservator, or similar officer, is unable to pay its debts as they become due, makes an assignment to or for the benefit of its creditors, or ceases to conduct business for any reason on an ongoing basis leaving no successor in interest.

12.5.   *Transition Assistance* - Provided that all undisputed payments have been made to Chimes, upon the expiration of this Agreement as provided in Section 2.1 or upon termination by Customer pursuant to Sections 12.1, 12.3, or 12.4, Chimes, if requested by Customer at least thirty (30) days in advance thereof will provide transition assistance to Customer, at no additional charge. Transition assistance shall include, by way of example but in no event shall such examples be conclusive, downloading all information and data regarding the program, specific to Customer, as directed by Customer, including without limitation all subcontracts and accompanying documentation.

*30*

12.6.   *Actions Upon Termination* - Upon termination of this Agreement for any reason, unless otherwise requested by Customer, Chimes shall promptly deliver to Customer all papers, documents, software programs, and other tangible items (including all copies) constituting Customer Confidential Information, Customer Information or Work Product in the possession of Chimes, or any of the Subcontract Suppliers or Consultants. In addition, Chimes shall provide all information and data regarding the program, specific to Customer, as directed by Customer and agreed upon by Chimes.

12.7.   *Termination of an Assignment* – Customer shall have the right to terminate an Assignment Order for cause, for any reason, or no reason immediately. Upon such termination, Chimes shall promptly deliver to Customer all papers, documents, software programs, and other tangible items (including all copies) constituting Customer Confidential Information, Customer Information, or Work Product in the possession of Chimes, any Subcontract Supplier, or any of the Consultants with respect to such Assignment Order.

12.8.   *Termination of a Specific Type of Consultant* – Either party may terminate this Agreement or Addendum as relates to a specific classification of temporary workers upon written notice of such termination at least ninety (90) days prior to the effective date of such termination.

**13.     ARTICLE XIII – TAXES**

13.1.   *Obligations* - With regard to all Consultant personnel who deliver the Services to Customer pursuant to this Agreement, Chimes and not Customer will be solely liable for any:

    a)  Federal, State or Local taxes based on or measured by Chimes' income or receipts;

    b)  Federal Insurance Contributions Act ("FICA") taxes;

    c)  Federal Unemployment Tax Act ("FUTA") contributions;

    d)  State Unemployment Insurance ("SUI") contributions and all other applicable payroll tax obligations; and

    e)  Any other applicable Federal, State, or local taxes that are the responsibility of the employer.

  Chimes will withhold all applicable Federal, State, and local income taxes, and the employee's share of FICA or other applicable payroll taxes borne by the employee.

  Customer will have no obligation to withhold Federal, State, or local income tax, or employee's portion of FICA or other payroll taxes, from any individual assigned by Chimes to provide Services hereunder; nor will Customer have any liability for any FICA, FUTA, or SUI contributions or other payroll taxes on behalf of any Consultant assigned by Chimes.

13.2.   *Timeliness* - Chimes will timely file and will cause each Subcontract Supplier to timely file all applicable tax returns, including income tax returns, employment tax returns, and information returns

*31*

required by law, in a manner consistent with its status as an independent provider of Services and as employer of individual personnel assigned hereunder. Chimes will make and will cause each Subcontract Supplier to make all required payments and deposits of taxes in a timely manner.

13.3. **Defense Cooperation** - In addition to Chimes' indemnification obligations under this Agreement, Chimes will cooperate and will cause each Subcontract Supplier to cooperate fully in the defense of any claim by a Federal, State, or local government authority against Customer regarding taxes assessed with respect to Chimes, such Subcontract Supplier, or any Consultant. Without limiting the generality of the foregoing, Chimes will, and will cause each Subcontract Supplier to, upon request by Customer, promptly furnish to Customer (i) documentary evidence in a form satisfactory to Customer of income tax returns and other filings, (ii) proof of payment of taxes by Chimes or the applicable Subcontract Supplier, (iii) copies of all Subcontract Supplier Agreements, and (iv) documentary evidence of employment agreements between Chimes or the applicable Subcontract Supplier and individuals providing Services.

## 14.    ARTICLE XIV - GENERAL PROVISIONS

14.1. **Security and Safety** - Chimes shall obey, and shall be responsible for ensuring that the Consultants and Chimes personnel providing the Services obey, whenever on Customer's premises, or remotely accessing Customer's computer or telecommunications networks, all applicable rules, regulations, and Customer policies and procedures, including Code of Conduct, those relating to confidentiality, privacy and security, safety and fire prevention rules, network and equipment use policies, and all reasonable instructions and directions issued by Customer. Notwithstanding the foregoing, in the event any Consultants or Chimes personnel require access to Customer's computer systems, Chimes shall ensure that Customer's Security Exhibit, attached hereto as Exhibit 9, is executed by each subcontracting company as a condition of such access. Chimes agrees to cooperate fully and shall provide any assistance necessary to Customer in investigation of any security breaches which may involve Consultants or Chimes personnel.

14.2. **Waiver** - A waiver by either of the parties of any of the covenants, conditions, or agreements to be performed by the other or any breach thereof will not be construed to be a waiver of any succeeding breach or of any other covenant, condition, or agreement contained in this Agreement.

14.3 **Non-Solicitation** - Each party agrees not to offer employment to hire, engage the services of, nor to use, directly or indirectly, the employees or consultants of the other outside of this Agreement, during the Term of this Agreement, any extension thereof, and for a period of six (6) months thereafter, without the written consent of the other party, provided however, that Customer shall have the right to directly hire Consultants (each such Consultant, a "Right to Hire Consultant") as employees of Customer without prior written consent of Chimes, whether or not the original requisition that Consultant was selected for stated it was a "right to hire/contract to hire/temp to perm, or the like" position, and upon payment of the applicable fee, if any, set forth in Schedule C. Additionally, Chimes shall agree in writing with each Subcontract Supplier not to solicit the resumes of, place, or hire any Consultant of such Subcontract Supplier except pursuant to Chimes' provision of the CVM Services to Customer or the placement of a Right to Hire Consultant with Customer during the term of the Subcontract Supplier Agreement between Chimes and such Subcontract Supplier, any extension thereof, and for a period of six (6) months thereafter without the written consent of such Subcontract Supplier. Chimes shall use best efforts to have all

32

Subcontract Suppliers and Participating Vendors agree to the following provision:

> "Notwithstanding anything to the contrary, with regard to any Consultant, pursuant to the Right to Hire provision hereunder, that UHS offers employment to, Subcontract Supplier will then waive (in writing) any non-compete or covenant (or any other similar restrictions) that would have restricted their employees and/or Consultant from accepting positions with UHS. Subcontract Supplier will provide the applicable Consultant and/or personnel and UHS copies of such waivers. Subcontract Supplier further agrees that it will (and hereby) represents and warrants to UHS that any and all Consultants and/or personnel UHS hires are not subject to any of the aforementioned restrictions, and Subcontract Supplier will not take any legal action to prevent such personnel from working for UHS."

Notwithstanding anything to the contrary in this Section, this Section and a Right to Hire Fee, pursuant to Schedule C, shall not apply in the event an employee or Consultant responds to a job posting made available to the public, such as listings on websites and in newspapers and is subsequently hired, except if the Consultant is currently working on an assignment with Customer and that same assignment is posted publicly on the website or newspaper as a direct hire position, and the Customer's representative and/or hiring manager wants to hire such Consultant for the posted position during the term a Right to Hire Fee would apply.

14.4    *Notices* - Any notice provided pursuant to this Agreement shall be in writing and shall be deemed given: (a) if by hand delivery, upon receipt thereof; (b) if mailed, three days after deposit in the mails, postage prepaid certified mail return receipt requested; (c) if by next day express delivery service, upon such delivery; and (d) if by facsimile transmission, at the time such transmission is confirmed electronically; provided that such notice is promptly confirmed by one of the other methods listed in this Section. All notice shall be addressed or sent by facsimile as follows:

| **United Health Group** | **Chimes, Inc.** |
|---|---|
| Attn: General Counsel, with a copy to Attn: Technology Procurement 9900 Bren Road East Minnetonka, MN 55343 Fax: 952-936-0044 | Attn: Jodi M. Gordon General Counsel 49 Old Bloomfield Avenue Mountain Lakes, NJ 07046 Fax: 973-299-4092 |

Either party may from time to time change its address for notification purposes by giving the other written notice of the new address and the date upon which it will become effective.

14.5    *Binding Nature and Assignment* - Neither party will assign, subcontract, or otherwise transfer or delegate its respective rights or duties under this Agreement to any third party except as expressly permitted herein without the prior written consent of the other party and any purported assignment, subcontract, delegation or transfer without the prior written consent of the other party will be void; provided however that Customer shall have the right to assign this Agreement without Chimes' prior written consent to any of Customer's affiliates or in connection with a merger, consolidation,

*33*

reorganization, or sale of su' antially all of Customer's assets. Any permitted assignee shall be bound by the terms and conditions of the Agreement.

14.6.  **Construction** - The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same effect as the word "shall." Articles and Section headings are for convenience only and will not be considered a part of the terms and conditions of the Agreement. If any provision of this Agreement is declared or found to be illegal, unenforceable or void, then both parties will be relieved of all obligations under such provision, but only to the extent that such provision is illegal, unenforceable, or void.

14.7.  **Insurance** - Chimes represents and warrants to Customer that the insurance coverage described below is in full force and effect with the limits of coverage described herein. Such insurance shall be maintained throughout the Term of this Agreement.

Chimes agrees that each insurance policy shall: (i) be maintained with an insurer having a rating of at least an A- in the most recently available Best's Insurance Reports; (ii) name Customer as additional insured and additional loss payee, where applicable; and (iii) shall provide for at least thirty (30) days' prior notice to Customer in the event of any modification or cancellation. Consultant shall also notify Customer at least thirty (30) days in advance if Consultant desires to modify or cancel any such insurance.

Additionally, Chimes covenants to Customer that it will make reasonable efforts to cause all Subcontract Suppliers to have Workers' Compensation, Commercial General Liability and Professional Liability insurance described herein that Chimes will obtain from Subcontract Suppliers and keep on file certificates of insurance to evidence such insurance. Chimes represents and warrants that Chimes' fidelity bond is written on a per-occurrence basis and that each of Chimes' fidelity bond and professional liability insurance cover Customer for losses caused by any Subcontract Supplier or its Consultants. Except where UHS agrees to waive the following insurance, Chimes will require all Professional Service Vendors to carry Professional Liability in addition to General Liability insurance in the amount of $1,000,000.00 each prior to commencement of Services. Professional Service Vendors who render medical related Services, malpractice insurance is acceptable in lieu of the Professional Liability insurance requirement.

Chimes shall furnish Customer and/or its designated representatives with certificates of insurance to evidence Chimes' compliance with the insurance requirements of this Section. Upon Customer's request, Chimes will promptly provide certificates of insurance for Subcontract Suppliers.

Customer shall reserve the right to amend the limits of insurance coverage as described herein. Such insurance shall not derogate Chimes' indemnity obligations to Customer set forth in this Agreement. Further, approval or acceptance of such insurance by Customer will not in any way represent that such insurance is sufficient or adequate to protect Chimes' interests or liabilities and such insurance coverage shall be considered the minimum acceptable coverage.

34

| Type of Insurance | Minimum Coverage Amount |
|---|---|
| Commercial automobile liability insurance combined single limit on any vehicles used by any Consultant in the course of providing Services hereunder. | $ 1,000,000 |
| Commercial General Liability Insurance. Combined single limit coverage to include blanket contractual liability, broad form damage and personal liability. | $ 1,000,000 |
| Workers' Compensation and Employers' Liability Insurance as mandated or allowed by the states in which the Services are being performed. | $ 1,000,000 |
| Professional Liability/ Errors and Omissions Liability, per occurrence where applicable. | $ 5,000,000 |
| Excess Liability Coverage | $ 4,000,000 |
| Fidelity Bond | $ 3,000,000 |

14.8.  **Counterparts** - This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

14.9  **Governing Law, Jurisdiction & Venue** - This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, without reference to its conflicts of law principles. The sole jurisdiction and venue for any litigation arising out of this Agreement shall be an appropriate federal or state court in the State of Minnesota in the county of Hennepin and the parties irrevocably consent to the personal jurisdiction of such courts.

14.10  **Survival** - Any provision of this Agreement which contemplates performance subsequent to any termination or expiration of this Agreement shall survive any termination or expiration of this Agreement and continue in full force and effect.

14.11  **Compliance with United States Export Regulations** – (i) Chimes hereby represents and warrants to Customer that Chimes, the Subcontract Suppliers, and the Consultants, (a) are, and will remain, in compliance with the requirements of all applicable U.S. export laws and regulations, including but not limited to the U.S. Export Administration Regulations, Office of Foreign Assets, control Regulations, and International Traffic in Arms Regulations; and (b) will not knowingly export or re-export directly or indirectly any software or technical data received from Customer or export the direct product thereof, directly or indirectly in violation of these regulations. This includes the responsibility not to export or re-export a Customer origin technical data or software to any end-user involved in, or for any end-user relating to missiles or nuclear, chemical, or biological weapons without appropriate U.S. government

35

authorization. Chimes will indemnify and hold harmless Customer from any costs, penalties, or other losses caused by or arising from any violation by Chimes or any Consultant of this Section or breach by Chimes or any Consultant of any of the representations and warrantees contained herein.
(ii) Export:

(a) Export Related to Services. If Chimes performs Services for UHS, Chimes warrants that Chimes will not, absent proper authorization and licensing, if applicable, from all United States agencies having jurisdiction, including without limitation the United States Bureau of Industry and Security (United States Department of Commerce) and the United States Department of State, and from any other relevant jurisdiction that requires any license or other government approval, Export any Item in the course of performing Chimes' Services hereunder. UHS makes no representations as to whether or under what conditions any Item supplied by UHS may be exported.

(b) Export Related to Software. UHS is permitted to Export any Item supplied hereunder by Chimes so long as UHS complies with all applicable export laws and regulations. Upon UHS' written request specifying any such Item and the country to which such Item is to be Exported, Chimes warrants that it shall, within seven (7) days after such request is received, respond in writing to UHS, specifying the Export Control Classification Number (as defined in 15 Code of Federal Regulations §772, as such regulation may be amended and in effect from time to time) for such Item, the Commodity Classification Automated Tracking System number, if any, assigned by the Bureau of Industry and Security, and whether, to Chimes' knowledge, a license is required to effect such Export, or any licensing exemption applies. Chimes shall cooperate with UHS and execute and deliver any further legal instruments and perform acts in connection with UHS' efforts to obtain any Export license for the Item.

(c) Definitions. For purposes of this Section, "Item" means any data, technology, commodity or other item, including without limitation, computer software, computer hardware, or telecommunications hardware or software or encryption device or algorithm, and "Export" means "export," "release," or "reexport," as those terms are defined in 15 Code of Federal Regulations §734.2(b), as such regulation may be amended and in effect from time to time.

14.12   Cumulative Remedies - Except as specifically provided herein, no remedy made available to either party hereunder is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy provided hereunder or available at law or in equity.

14.13   Modifications - No modification, amendment, supplement to, or waiver of this Agreement or any of its provisions shall be binding upon the parties hereto unless made in writing and duly signed by both parties.

14.14   Disabilities - Chimes agrees to comply with the requirements listed in the attached Certificate of Compliance with Equal Employment Opportunity Law Exhibit 3 to this Agreement, to the extent required by law. Chimes further agrees to comply with the requirements as delineated in the attached Exhibit 7, Medicare Regulatory Addendum, Exhibit 9, Security Exhibit and Exhibit 10 Code of Conduct – Integrity and Compliance.

*36*

14.1    **Complete Agreement** - This Agreement, including all Schedules and Exhibits hereto, contains the
entire understanding of the parties and may be amended only by a writing signed by the parties. This
Agreement shall supersede any prior agreements between the parties in regard to the same subject matter,
including the Prior Agreement.

IN WITNESS WHEREOF, Chimes and Customer each have caused this Agreement to be signed
and delivered by its duly authorized representative.

Chimes, Inc.

By: _____

Name: Arthur G. Hilton, Jr.

Title: COO
Date: 1/31/07

United HealthCare Services, Inc.

By: _____

Name: G. Mike Mikan

Title: Executive Vice President and Chief Financial Officer
Date: 2/2/07

## TABLE OF SCHEDULES AND EXHIBITS

| SCHEDULE OR EXHIBIT | DESCRIPTION |
|---|---|
| Schedule A | Performance Standards |
| Schedule B | Fees |
| Schedule C | Right to Hire Fees |
| Schedule D | Discounts |
| Schedule E | Payment Schedule |
| Exhibit 1 | CVM Project Office Review Form |
| Exhibit 2 | Assignment Order |
| Exhibit 3 | Agreement with Certification of Compliance with Federal Laws and Regulations |
| Exhibit 4 | Contingent Worker User Guide and Agreement |
| Exhibit 5 | Change Request |
| Exhibit 6 | Pre-Employment/Pre-Placement Screening Matrix |
| Exhibit 7 | Medicare Regulatory Addendum |
| Exhibit 8 | HIPAA/GLB Compliance |
| Exhibit 9 | Security Exhibit |
| Exhibit 10 | Code of Conduct |
| Attachment A | Subcontract Supplier Agreement(s) ( SSA) (1) SSA for IT Services (2) SSA for Non-IT (Temp Services) (3) Professional Service Agreement (4) Participating Vendor Agreement (5) Right to Hire Project – Addendum (6) Vendor Access Agreement |

*38*

## SCHEDULE B

## FEES

REDACTED

2.    Participating Vendors (f/n/a Non-Preferred Vendors) – Vendors who do not execute a Subcontract Supplier Agreement with Chimes will be identified as Participating Vendors. Chimes will not establish a contractual relationship with these vendors, except require the Participating Vendors to execute an Access Agreement to utilize the Chimes Electronic Time & Entry System (CTS). Chimes will, upon Customer's request, perform as billing and paying agent for consulting services provided by each Participating Vendor designated by Customer. Chimes will charge each such Participating Vendor a monthly Service Fee based on the number of hours billed for such Participating Vendor. The Service Fee will be ████ per hour for each hour billed for the applicable Participating Vendor. The Service Fee will be deducted from Chimes' payment to the applicable Participating Vendor and will be retained by Chimes in consideration of the CVM offering. The Service Fee for each Participating Vendor will be computed monthly based on the total number of hours billed for such Participating Vendor as provided by CTE. Chimes shall have no responsibility or obligation to Customer with respect to any Participating Vendor except the payment obligations expressly set forth in this Agreement.

REDACTED

*39*

| In re: **Axium International, Inc., et al.**<br>    Also: In re Diversity MSP, Inc., et al. (2:08-bk-10376-BB)<br><br>                                          Debtor(s) | CHAPTER: 7<br><br>CASE NUMBER: 2:08-bk-10277-BB |
| --- | --- |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: Hogan & Hartson LLP, **1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067**

A true and correct copy of the foregoing document described as **Limited Opposition of United HealthCare Services, Inc. to Chapter Trustee's Motion for Order Authorizing Settlement of Certain Avoidance Power Claims Without Further Hearing or Notice Pursuant to Rule 9019(b) of the Federal Rules of Bankruptcy Procedure; Declaration of Eric J. Noyes** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d), and (b) in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the addressed indicated below:

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served): On September 22, 2009 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 22, 2009** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Sheri Bluebond **(Personal Delivery)**
United States Bankruptcy Court
255 East Temple Street, Courtroom 1435
Los Angeles, CA 9

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 22, 2009 | _Marjorie Sener_ | _Marjorie Sener_ (signature) |
| --- | --- | --- |
|  | Type Name | Signature |

Case No.: 2:08-bk-10277-BB

40

1

**SERVICE LIST**
**BY OVERNIGHT DELIVERY**

2

3    United States Trustee
      : Jill Sturteva
4     S. Figueroa Street, 26th Floor
     Los Angeles, CA    17

5    Howard M. Ehrenberg, Trustee
      meyer Kupetz
6     : Daniel A. Lev
      South Hope Street, 35th Floor
7     Angeles, CA    71

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

41

LA - 086335/000040 - 447844 v1